**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED,** | **MEMORANDUM DECISION AND ORDER DENYING TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| Plaintiff, | |
| vs. | |
| **REX BAXTER and PAUL AIMAN,** | Case No. 1:09CV45DAK |
| Defendants. | |

This matter is before the court on the Plaintiff Merrill Lynch, Pierce, Fenner & Smith Inc.'s Motion for a Temporary Restraining Order and Preliminary Injunction, filed April 3, 2009. The motion seeks to enjoin Rex Baxter and Paul Aiman, two financial advisors who resigned from their employment with Merrill Lynch on April 3, 2009, from soliciting clients and using customer information obtained while employed with Merrill Lynch. On April 6, 2009, Defendants filed a memorandum in opposition to Plaintiff's motion. Plaintiff has not filed a reply memorandum due to its request to hold a hearing as expeditiously as possible.

On April 7, 2009, the court held a hearing on Plaintiff's motion. Plaintiff was represented by Brent O. Hatch, Jason E. Murtagh, and Beth Delaney, and Defendants were represented by Mark W. Pugsley and Kristine M. Larsen. At the hearing, the court heard testimony from Defendant Rex Baxter and Jess Shackleford, Plaintiff's Business Manager for the region including Utah. The parties also submitted documentary evidence in addition to that submitted with their briefs, and the court heard legal argument from counsel. The court took the motion

under advisement.  Based on the law and facts relevant to the pending motion, the court enters

the following Memorandum Decision and Order.

## BACKGROUND

Merrill Lynch seeks a temporary restraining order against Rex Baxter and Paul Aiman,

two financial advisors who formerly worked in Merrill Lynch's Ogden, Utah office.  Baxter

began working for Merrill Lynch on July 31, 1997, and Aiman began working for Merrill Lynch

on February 14, 1989.  Both defendants resigned their employment with Merrill Lynch on April

3, 2009, and have joined one of Merrill Lynch's competitors, Ameriprise Financial Services.

Baxter and Aiman have been working as a sales team and share commissions.

Merrill Lynch alleges that Defendants misappropriated confidential and proprietary data

and sensitive customer information in violation of their employment agreements with Merrill

Lynch, Merrill Lynch's policies and procedures, and Utah law.  Aiman and Baxter both provided

declarations that they are not in possession of any of Merrill Lynch's confidential or trade secret

information.  At the hearing on Merrill Lynch's motion, the evidence was clear that Baxter has

only a Christmas card list including client's home addresses and some clients' contact

information programmed in his cellular telephone.  There is no evidence that Aiman has any

contact information other than what is available to him from Baxter.

After resigning on April 3, 2009, Baxter provided the client contact information to

Ameriprise, who used the information to send out an announcement to the clients Defendant's

had while employed at Merrill Lynch.  Baxter also testified that since leaving Merrill Lynch he

has spoken to clients he had while employed at Merrill Lynch.

While Baxter was still employed with Merrill Lynch, on or about March 5, 2009, Baxter

sent an email from his Merrill Lynch email address to his home or personal email address.  The

email included an attachment titled "TimeStudy.xls."  The attachment contained embedded customer data and information, including customer names, addresses, account numbers, account types, and assets and liabilities for Merrill Lynch customers.  Merrill Lynch detected the email, and on March 9, 2009, Merrill Lynch management confronted Baxter regarding the attachment containing customer data and information.  Emailing any type of customer information or data to non-Merrill Lynch email addresses, outside the Merill Lynch firewall, is prohibited by Merrill Lynch policies and procedures.  Baxter admitted to sending the email, admitted that it was a mistake, and agreed to delete the email.  In the meeting, Baxter also responded to questions about his future plans.  He indicated that he had no intention of leaving Merrill Lynch in the next two weeks, but indicated that he had been heavily recruited by competitors.

Baxter went home that evening and deleted the email from his home computer.  He did not send or give the information in that email to anyone else.  On or about March 10, 2009, Baxter told his Branch Manager, Dwight Baldwin, that he had purged the email and attachment from his home computer.

To protect customer confidentiality and to enforce its policies regarding confidential customer information, Merrill Lynch management directed Merrill Lynch's outside counsel to prepare an Affidavit for Baxter in which he would promise that he was the only individual who accessed the email, that he did not forward the email to anyone else, that he had physically purged the email from his possession in a way that neither he nor anyone else would be able to reconstruct the data, that he was no longer personally in possession of any documents or information of any kind containing any Merrill Lynch customer information, and that he did not share or otherwise provide Merrill Lynch customer information of any kind and in any form to any third party.

3

In late March 2009, Merrill Lynch management presented the Affidavit to Baxter for his signature. Baxter requested time to review it prior to signing it. Baxter did not sign the Affidavit prior to resigning on April 3, 2009. But the evidence demonstrates that Baxter was no longer in possession of the email on the date he resigned, he did not give the information contained in the email to anyone else, and he did not use the information in the email when he provided Ameriprise with client contact information.

Shackleford testified that any customer information outside of Merrill Lynch's office is against company policy. But there was evidence that Merrill Lynch encouraged its Financial Advisors to send out personal Christmas cards. In addition, Shackleford testified that the company had not held a meeting regarding information contained on a cellular telephone until after Defendants had resigned. Shackleford testified that he had not taken action with respect to information contained on cellular telephones prior to the company's recent meeting.

Upon commencement of employment with Merrill Lynch, Baxter executed an employment contract that provides, in relevant part, as follows:

> All records, whether original, duplicated, computerized, memorized, handwritten, or in any other form, and all information contained therein, including names, addresses, phone numbers, and financial information of any account, customer, client, customer lead or prospect ("Account"), are confidential and are the sole and exclusive property of Merrill Lynch. This information, whether provided to me by Merrill Lynch or by any Account, is entrusted to me as an employee and sales representative of Merrill Lynch. I will not use this information or remove any such records from the Merrill Lynch office except for the sole purpose of conducting business on behalf of Merrill Lynch. I agree not to divulge or disclose this information to any third party and under no circumstances will I reveal or permit this information to become known by any competitor of Merrill Lynch either during my employment or at any time thereafter.

The employment agreement further stated that "[i]f, at any time, I resign from Merrill

Lynch, . . . I agree that for a period of one year following my termination I will not solicit by mail, by phone, by personal meeting, or by any other means, . . . any Account whom I served or whose name became known to me during my employment at Merrill Lynch in any office and in any capacity."

Baxter also expressly consented in his employment agreement with Merrill Lynch to the issuance of preliminary injunctive relief in court in the event that he breached the terms of the employment contract.  "In the event I breach any of the covenants of paragraphs 1,2, or 3, I agree that Merrill Lynch will be entitled to injunctive relief.  I recognize that Merrill Lynch will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Merrill Lynch or to protect and preserve the status quo."

Aimen also executed an employment agreement with Merrill Lynch upon commencement of his employment.  His employment contract provides that "All records of Merrill Lynch, including the names and addresses of its clients are and shall remain the property of Merrill Lynch at all times during my employment with Merrill Lynch and after termination of my employment for any reason with Merrill Lynch. . . . All of said records or any part of them are the sole proprietary information of Merrill Lynch and shall be treated by me as confidential information of Merrill Lynch."  Aiman also agreed that "I will (i) not solicit, for a period of one year from the date of termination of my employment, any of the clients of Merrill Lynch whose names became known to me while in the employ of Merrill Lynch . . . and (ii) return any original records and purge or destroy any computerized, duplicated, or copied records referred to in paragraph 1 which have been removed from the premises of Merrill Lynch in any form."

Aiman further agreed to the issuance of preliminary injunctive relief in court in the event that he breaches the terms of his employment contract.  "This agreement shall be construed, and

the validity, performance and enforcement thereof shall be governed by the laws of the State of Utah.  I further consent to the issuance of a temporary restraining order or a preliminary injunction to prohibit the breach of any provision of this contract, or to maintain the status quo pending the outcome of any arbitration proceeding which may be initiated."

Also, in an undated Team Compensation Agreement, both Baxter and Aiman acknowledged that they had entered into agreements with Merrill Lynch in which they had "agreed not to solicit any account, customer, client, or customer lead or prospect upon termination of employment."

In 2004, Merrill Lynch voluntarily entered into an industry agreement known as the Protocol for Broker Recruiting.  The Protocol provides that neither the departing broker nor the firm he joins will have any liability to the firm the broker left as a result of the broker taking certain client contact information or the solicitation of the clients serviced by the broker at his or her prior firm.  The Protocol recognizes that it has become commonplace for brokers to move around to competing firms.  The Protocol is expressly designed to "further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives between firms."  Under the Protocol, registered financial advisors may take the client names, addresses, telephone numbers, email addresses, and account titles of clients they serviced at their prior firm and use that client contact information to solicit their clients once they have joined their new firm.

Ameriprise, the firm Baxter and Aiman joined after resigning from Merrill Lynch, is not a signatory to the Protocol.

## DISCUSSION

### Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction

Merrill Lynch seeks a temporary restraining order enjoining Defendants from soliciting

Merrill Lynch customers and requiring Defendants to return and purge from their possession all

information and documents unlawfully misappropriated, including, but not limited to, client files

and information containing the names and addresses of Merrill Lynch customers, their account

numbers, financial statements, investment objectives, assets, net worths, investment histories,

and other financial information.

In order to obtain a temporary restraining order or preliminary injunctive relief, the

moving party must establish:

> (1) a substantial likelihood of success on the merits; (2) irreparable
> harm to the movant if the injunction is denied; (3) [that] the
> threatened injury outweighs the harm that the preliminary
> injunction may cause the opposing party; and (4) [that] the
> injunction, if issued, will not adversely affect the public interest.

*General Motors Corp. v. Urban Gorilla, LLC,* 500 F.3d 1222, 1226 (10th Cir. 2007); *SCFC ILC,*

*Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991).  "Because a preliminary injunction

is an extraordinary remedy, the right to relief must be clear and unequivocal."  *Greater*

*Yellowstone Coal v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003).

### 1.  Irreparable Harm

"[B]ecause a showing of probable irreparable harm is the single most important

prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate

that such injury is likely before the other requirements of the issuance of the injunction will be

considered."  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260

(10th Cir. 2004).

Merrill Lynch argues that it will be impossible to determine its damages with any reasonable degree of certainty because Defendants serviced 180 customers holding millions of dollars in assets under Merrill Lynch management.  Merrill Lynch claims that it is impossible to determine with any degree of certainty the commissions each of these clients will generate not only this year, but 5, 10, or 20 years into the future.

However, in *Merrill Lynch v. Brennan*, 2007 WL 632904 (N.D. Ohio Feb. 23, 2007), a case very similar to the instant case, the court denied Merrill Lynch's motion for a temporary restraining order on the grounds that it failed to demonstrate irreparable harm.  *Id.* at *2.  The court reasoned that Merrill Lynch's arguments that damages were incalculable was outdated given the changed circumstances in the securities industry.  *Id.* (citing *Merrill Lynch v. Martin*, No. 98CV1408 (N.D. Ohio 1998)).  Another court has recognized that damages in these types of cases are calculable because "the securities industry is highly regulated," "each individual transaction is monitored electronically," "every customer transfer . . . is documented," and "[e]very dollar earned in fees by Defendant . . . doing business with those customers that [the plaintiff] considers its own can be traced precisely."  *Morgan Stanley Dean Witter, Inc. v. Frisby & Lovell*, 163 F. Supp. 2d 1371, 1376 (N.D. Ga. 2001).

This court agrees that Merrill Lynch's alleged damages from lost commissions are calculable monetary damages.  These types of damages do not provide a basis for injunctive relief.

Merrill Lynch argues that its irreparable harm is not only based on loss of commissions but includes intangibles such as the loss of goodwill and customer trust.  Although Merrill Lynch claims that it is harmed by a loss of customer information and financial data, there is no evidence that Defendants have any client's financial data in their possession.  The customer information in

Defendant's possession is the type of public information available in telephone directories–names, addresses, and telephone numbers.

Moreover, Merrill Lynch's participation in the Protocol for Broker Recruiting impacts this aspect of the irreparable harm analysis.  The *Brennan* court recognized that Merrill Lynch's participation in the Protocol "indicates that they understand the fluid nature of the industry; brokers routinely switch firms and take their client lists with them."  *Id.* at *2.  By agreeing to a procedure for departing brokers to take and use client contact information, "Merrill tacitly accepts that such an occurrence does not cause irreparable harm."  *Id.*

Merrill Lynch argues that the Protocol is a forbearance agreement that does not apply in this case because Ameriprise is not a signatory to the Protocol.  This specific argument was raised by Smith Barney, and rejected by the court, in *Smith Barney v. Griffin*, 2008 WL 325269 at *5 (Mass. Super. Jan. 23, 2008).  The *Griffin* court agreed that as a contractual matter, the Protocol was irrelevant, but concluded that as to the propriety of granting equitable injunctive relief, the Protocol was relevant.  *Id.*  The court reasoned that "if there truly was a significant risk of substantial irreparable harm from departed financial advisors soliciting their former clients, one would not expect Smith Barney to have entered into a Protocol permitting precisely that." *Id.* at *7.  "When Smith Barney permits its financial advisors to leave for 38 other financial institutions and solicit their former clients with Client Information they took from Smith Barney, it cannot credibly contend that the harm that will result if Griffin is allowed to do the same at a 39th firm is so substantial and so irreparable that this Court should exercise its equitable authority to prevent it and thereby limit Griffin's ability to compete for these clients in her new job." *Id.*

Similarly, in *Brennan*, the court disagreed with Merrill Lynch's argument that it had

allegedly suffered a loss of customer trust and goodwill once the customer learned that his or her

information had been given to another party.  2007 WL 632904 at *3.  The court stated that

"given the existence of the Protocol, it appears that Merrill and industry peers are well aware of,

and content with, the idea that brokers will leave and take client lists with them.  Such an

agreement significantly undercuts the notion that such behavior destroys customer goodwill."  *Id.*

The *Griffin* court recognized that "through the Protocol, Smith Barney has implicitly

recognized that there is an alternative way to protect its goodwill when a financial advisor leaves

for another firm--promptly identify the clients of the departed financial advisor and seek to

persuade them to stay."  2008 WL 325269 at *7.

In this case, Defendants have no more information than they would be allowed to take

under the Protocol.[1]  Defendants did not take the client information from Merrill Lynch.  Merrill

Lynch retains the records of Defendants' clients, including contact information for each client as

well as the financial account information for each client.  Defendants merely recreated a client

contact list through a personal Christmas card list and cellular telephone entries.  This is not a

case where Defendants attempted to impede their former employer's ability to make contact with

their clients.  In fact, Defendants' declarations state that they are aware that Merrill Lynch has

already been contacting these clients in an attempt to keep them as Merrill Lynch customers.

Therefore, in this case, as in departures allowed under the Protocol, the broker and the firm are

---

[1]  The contact information Defendants possess is the same type of information firms allow brokers to take with them under the Protocol.  Courts have recognized that "by allowing its departing financial advisors to leave with this Client Information [allowed under the Protocol], Smith Barney is effectively declaring that it does not consider this Client information to be 'nonpublic personal information' under the federal Gramm-Leach-Bliley Act."  *Griffin*, 2008 WL 325269 at *7.  "Since one can infer that Smith Barney (and the other 38 signatories) did not intend to violate the Act by signing the Protocol, one can infer that Smith Barney determined that Client Information falls outside the rubric of 'nonpublic personal information.'"  *Id.*

on an equal footing with respect to client solicitation.[2]

Merrill Lynch is in no different position than it would have been had Defendants moved to a firm that is a signatory to the Protocol.  If customer confidence is not undermined when a departing broker leaves for another Protocol firm, it is difficult to comprehend why customer confidence constitutes irreparable harm when a departing broker goes to a non-Protocol firm.  In both situations, the client would be aware of the broker's departure.  Given Merrill Lynch's recognition in the Protocol that as a practical matter financial advisors often move to competing firms, it does not follow that such movement creates a poor reflection on the firm.  Each firm loses some brokers and gains others.  Moreover, a mere risk of irreparable harm is insufficient to invoke equitable injunctive relief.  *See Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 545 (1987).

Accordingly, the court concludes that Merrill Lynch has not met its burden of establishing by clear and convincing evidence that it is irreparably harmed by Defendants' possession or use of the client contact information at issue.

### 2.  Balance of Harms

The balance of harms element is closely related to the irreparable harm element.  Under the balance of harms element, "a court must balance the competing claims of injury and must

---

[2]  In addition, the court notes that the definition of the goodwill at issue is itself complicated in these types of cases.  The *Griffin* court aptly recognized that "[t]he dilemma is that, to some degree, the company's goodwill and the employee's goodwill are inevitably intertwined."  2008 WL 325269 at *4.  While financial advisors obtain most of their clients on their own, as is the case with the defendants in this case, there are some clients that financial advisors obtain as a result of the client's loyalty to the firm.  A company is only entitled to protect its own goodwill.  "The goodwill . . . that a financial services company legitimately may preserve is its own goodwill, not the goodwill earned by the employee."  *Id.*  The equal footing Merrill Lynch agreed to under the Protocol appears to reflect an understanding of this intertwined goodwill.

consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production*, 480 U.S. at 542.

Courts have recognized that "[b]rokerage firms can survive the denial of an injunction far more readily than their departing employees can survive its issuance." *Morgan Stanley Dean Witter*, 163 F. Supp. 2d at 1382. "Because the effect of the loss of income pending the outcome of this dispute would, by reason of the differing financial strengths of a large brokerage firm and an individual broker, bear far more heavily on [the brokers] than on Merrill Lynch, that disparity of effect supports denial of an injunction." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. de Liniere*, 572 F. Supp. 246, 249 (N.D. Ga. 1983).

In this case, the testimony solicited at the evidentiary hearing established that Defendants have spent their entire financial careers at Merrill Lynch building their customer base of 180 clients and are considered by Merrill Lynch to be only mid-level producers. A temporary restraining order barring Defendants from any contact with their clients would effectively cripple their careers. Few of Defendants clients were assigned to Defendants by Merrill Lynch. The court, therefore, concludes that the harm to Defendants if this court entered equitable injunctive relief would far outweigh the harm to Merrill Lynch if such relief is denied. Accordingly, the court concludes that Merrill Lynch has not met its burden of demonstrating that the balance of harms weighs in its favor.

### 3. Public Interest

There are also competing interests with respect to the public interest element. Courts have recognized that injunctions in similar cases promote the public interest in the enforcement of contracts. *Merrill Lynch v. Ran*, 67 F. Supp. 2d 764, 781 (E. D. Mich. 1999). However, other courts have emphasized that "[t]he 'public's ability to choose the professional services it prefers,'

is central to the consideration of this criterion of injunctive relief." *deLiniere*, 572 F. Supp. 246, 249 (N. D. Ga. 1983). Courts have found that "[a] brokerage customer's right to obtain financial advice from his or her chosen representative outweighs any interest of the brokerage firm." *Merrill Lynch, Pierce, Fenner & Smith v. Abdallah*, No. 45D11-0608-PL-77, slip op. at 12 (Ind. Super. Ct. Aug. 7, 2006) (attached as Ex. H to Def. Mem. Opp.) (citing *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Goodson*, 820 F. Supp. 1128, 1131 (S. D. Ind. 1993)). This public interest is heightened in light of the turbulent market conditions over the past year. However, Merrill Lynch's requested temporary restraining order would prohibit Defendants from even notifying their customers that they had changed brokerage firms.

While Merrill Lynch relies heavily on the public interest in enforcing contracts, under the Protocol, it routinely ignores the same contractual requirements it seeks to enforce in this case. A random enforcement of non-solicitation agreements does not carry with it a strong public interest. Part of the reasoning behind the public interest in enforcing contracts is a respect for the rule of law. The *Ran* court, decided prior to the Protocol, found that unless it enforces "the terms of the contracts entered into by the sophisticated parties and entities [before it], the court will be undermining the legitimate business expectations not only of the parties here, but of all contracting parties." 67 F. Supp. 2d at 781.

But the brokerage houses who are signatories to the Protocol have voluntarily chosen not to enforce many of the non-solicitation contracts they enter into with their brokers. By so doing, these companies, such as Merrill Lynch, have significantly weakened the business expectations of all the contracting parties with respect to the enforcement of their non-solicitation agreements. When brokers watch other brokers take client lists to new firms and suffer no consequences, it

creates questions as to the enforcement of their own agreement.[3]

Because of the diminished public interest in Merrill Lynch's selective enforcement of its non-solicitation agreements and the significant public interest in clients being able to continue communicating with a financial advisor they have chosen, the court concludes that Merrill Lynch has not demonstrated that the public interest element weighs clearly and convincingly in its favor.

## 4. Likelihood of Success on the Merits

Finally, Merrill Lynch argues that it has demonstrated a likelihood of success on the merits on its breach of contract claim and Utah Trade Secrets Act claim. Because the court has already concluded that Merrill Lynch has failed to meet the other three required elements for preliminary injunctive relief, the court need not address this element. Nonetheless, the court is doubtful that Merrill Lynch could meet its burden on this element given the disfavored nature of restrictive covenant agreements and the Protocol's impact on a determination of Merrill Lynch's legitimate business interests. The court, however, is mindful that the parties will proceed to arbitration on the merits of the case and the issues can be fully addressed in those proceedings. This court, however, concludes that there is no basis for awarding Merrill Lynch injunctive relief prior to a determination of the case on the merits.

---

[3] At the hearing on Merrill Lynch's motion, its Business Manager admitted that it has not brought legal action against all of the brokers who recently resigned and went to Ameriprise. In fact, Merrill Lynch had not followed up to see whether Ameriprise had sent announcements for two of the brokers.

**CONCLUSION**

Based on the above reasoning, Plaintiff's Motion for a Temporary Restraining Order and

Preliminary Injunction is DENIED.

DATED this 8th day of March, 2009.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge